IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:01-CV-27-H(3)
NO. 4:01-CV-30-H(3)

FILED
SEP 20 2001
DAVID W. DANIEL, CLERK
US DISTRICT COURT
E. DIST. N. CAROLINA

| | |
|---|---|
| WATER KEEPER ALLIANCE, INC., THOMAS E. JONES, d/b/a/ NEUSE RIVERKEEPER, and NEUSE RIVER FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> SMITHFIELD FOODS, INC., BROWN'S OF CAROLINA, INC., (allegations involving facility #9/#22) <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| WATER KEEPER ALLIANCE, INC., THOMAS E. JONES, d/b/a/ NEUSE RIVERKEEPER, and NEUSE RIVER FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> BROWN'S OF CAROLINA, INC., (allegations involving facility #5/#6), <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**ORDER**

CIV OB #67, P-47

This matter is before the court on defendants' motions to dismiss. The time for responding has expired. This matter is ripe for adjudication.

**STATEMENT OF THE CASE**

On February 28, 2001, plaintiffs, citizens committed to the

protection of the Neuse River watershed in North Carolina, filed two complaints: one against Brown's of Carolina ("Brown's" or the "farms") encompassing activities allegedly occurring at Brown's of Carolina Facility #5/#6 (No. 4:01-CV-30), and the other against Brown's and Smithfield Foods, Inc., ("Smithfield") encompassing activities allegedly occurring at Brown's of Carolina Facility #9/#22 (4:01-CV-27). Plaintiffs' complaints allege numerous violations of the Clean Water Act ("CWA") and the Resource Conservation and Recovery Act ("RCRA").

On May 4, 2001, defendants filed motions to dismiss. In an order dated August 7, 2001, the court denied Smithfield's individual motions to dismiss, and set oral arguments on the defendants' remaining motions to dismiss. On September 6, 2001, the court heard oral arguments relating to the parties' positions.

## COURT'S DISCUSSION

### I. Standard of Review

In reviewing a motion to dismiss, the court should view the allegations of the complaint in the light most favorable to the plaintiff. See De Sole v. United States, 947 F.2d 1169 (4th Cir. 1991). The court must accept the factual allegations of the complaint but is not bound with regard to its legal conclusions. See United Mine Workers of America, Inc. v. Wellmore Coal Corp., 609 F.2d 1083, 1085 (4th Cir. 1979). Plaintiffs are entitled to

2

reasonable inferences by the court in ruling on a motion to dismiss. See Mylan Lab., Inc. v. Akzo, N.V., 2 F.3d 56 (4th Cir. 1993). Motions to dismiss are granted only where the plaintiff can not prove any set of facts which would entitle him to relief. See Mylan Lab., Inc. v. Matkari, 7 F.3d 1130 (4th Cir. 1993).

## II. Motion to Dismiss under Rule 12(b)(1) for Lack of Subject Matter Jurisdiction

Defendants argue that plaintiffs have not plead sufficient facts to establish this court's subject matter jurisdiction or state claims under the CWA and RCRA. With respect to defendants' argument that plaintiffs have not sufficiently alleged facts supporting subject matter jurisdiction, the court finds the arguments unpersuasive, and rejects their contentions without further comment.

## III. Motion to Dismiss for Failure to State a Claim

### A. Count I

Plaintiffs allege in Count I that defendants' operate concentrated animal feeding operations ("CAFO") which discharge pollutants, and that defendants' failure to obtain National Pollutant Discharge Elimination System ("NPDES") permits constitutes violations of the CWA. In support of their motion to dismiss Count I, defendants advance two arguments. First, defendants argue that the CWA does not create a cause of action for

3

operating a CAFO[1] without a permit. Second, defendants argue that even if the CWA makes operating without a permit unlawful, their operations are not subject to the permit requirement because they are not CAFOs.

The court first addresses defendants' assertion that the CWA does not create a cause of action for <u>operating</u> without a required permit, but only creates liability for unlawfully discharging pollutants. In support of their position, defendants point to section 301 of the CWA which states that except as otherwise permitted by the Act, "the <u>discharge</u> of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a) (emphasis added). The court is unpersuaded by defendants' argument that the CWA does not create a cause of action for operating without a required permit.

First, the text and structure of the CWA taken as whole support the court's conclusion that the CWA subjects CAFO to the permit requirement even on days when they are not discharging. While the CWA generally prohibits discharge of pollutants, section 402 provides for the discharge of pollutants through a permit system. <u>Id.</u> § 1342(a)(1). "An NPDES permit serves to transform generally applicable effluent limitations and other standards-including those based on water quality-into the obligations . . .

---

[1] While defendants call themselves "farms," it is clear that plaintiffs' complaints are not directed at the everyday "mom and pop" family farms. Instead, plaintiffs' complaints are directed toward the larger, more industrialized operations which come within the definition of "concentrated animal feeding operations."

4

of the individual discharger." EPA v. California, 426 U.S. 200, 205, 96 S. Ct. 2022, 2025 (1976). Failure of a permit holder to comply with the terms of a permit constitutes a violation of the CWA.

The CWA requires point sources to have a permit to discharge pollutants. Point source is defined to include CAFO. 33 U.S.C. § 1364(14). To be considered a CAFO, an animal feeding operation must contain more than a specified number of animals and discharge pollutants into navigable waters. 40 C.F.R. § 122 app. B. Plaintiffs' complaints allege, and defendants admit, that defendants' facilities meet the size requirements for CAFOs and that defendants discharge pollutants into navigable water. Thus, if defendants cannot prove that they fall within a CAFO exception, defendants are subject to the CWA's permit program prior to making future discharges. The language of the statute does not limit defendants' obligation to operate under and in compliance with a permit program to the days that defendants actually discharge pollutants. Instead, the permit requirement serves to regulate and monitor defendants' conduct before, during, and after future discharges.

Additionally, EPA regulations and the goals served by the permit program support plaintiffs' position that CAFOs discharging pollutants are required to have a valid permit even on days when discharges are not made. The Code of Federal Regulations states

5

that "concentrated animal feeding operations are point sources subject to the NPDES permit program." 40 C.F.R. § 122.23(a).[2] The permit program serves as an important tool for not only allowing pollution discharges, but also for providing important enforcement and monitoring mechanisms through the establishment of various inspection, testing, and reporting requirements. See, e.g., 40 C.F.R. § 122.44. Without the authority to require defendants to obtain a permit, the utility of these monitoring and enforcement mechanisms would be greatly compromised.

Finally, case law dealing with CAFOs supports plaintiffs' position that a CAFO's failure to have a required permit is an independent violation of the CWA. See Carr v. Alta Verde Indus., Inc., 931 F.2d 1055, 1057 (5th Cir. 1991) (stating that defendants' "failure to obtain a [NPDES] permit amounted to a continuing violation of the" CWA); American Canoe Ass'n, Inc. v. Murphy Farms, Inc., No. 7:98-CV-4(F)(1), at 3 (E.D.N.C. Dec. 22, 1998) ("The defendants are required to apply for an NPDES permit. . . ."). The court concludes that plaintiffs have stated a claim under the CWA for defendants' alleged failure to apply for a NPDES permit.

Defendants next assert that, even if an independent cause of

---

[2] The court also notes that the EPA's proposed revisions to CWA regulations establish an affirmative obligation for CAFO to apply for a permit unless the CAFO bears the burden of showing that it has no potential to discharge pollutants. While proposed regulations are not binding on the court, they do indicate that the plaintiffs' interpretation of the statute is both reasonable and supported by the EPA, the federal agency charged with administering the CWA. See Public Commenter's Guide to the Proposed New CAFO Regulations, http://www.epa.gov/OW-OWM.html/afos/comguide.pdf (May 31, 2001, at 7).

6

action exists for CAFO operating without having a NPDES permit, defendants are not CAFO under the 25-year, 24-hour storm event exception. Defendants maintain that regardless of whether they actually discharge large quantities of pollutants into navigable waters, defendants are entitled to a purported "design" exemption if they can show that their operations are "designed" to contain a 25-year, 24-hour storm event. Even if the court were to accept defendants' purported "design" exception, the question of whether defendants' facilities are "designed" to contain a 25-year, 24-hour event is a question of fact not appropriately resolved under a motion to dismiss. Accordingly, defendants' motion to dismiss Count I is DENIED.

## B. Count III

Defendants also move to dismiss Count III under the theory that sprayfields on defendants' lands are not point sources and do not come within the definition of a CAFO under the CWA. Defendants also argue that sprayfields should not be considered a point source because runoff from sprayfields comes within the agricultural storm water exemption.[3]

The CWA regulates the discharge of pollutants and defines "discharge of pollutant" as "any discernable, confined and discrete

---

[3] Plaintiffs concede that they cannot base Count III on a violation of North Carolina's animal waste management plan. Plaintiffs contend that the facts relating to the state plan provide relevant background information for Count III, and are not an attempt to bring an action under state law. The court accepts plaintiffs' concession and DENIES defendants' motion to dismiss Count III for alleging a violation of the CWA under state law.

7

conveyance from any point source." As noted above, point source is defined to included CAFO, and animal feeding operations come within the definition of a CAFO by having specified quantities of animals and discharging pollutants into navigable waters. 33 U.S.C. § 1364(14).

Plaintiffs' complaint represents that the defendants' swine are confined in metal buildings their entire life. To remove the large quantities of waste inside the animals' living area, defendants collect the waste in large areas beneath the building. The areas underneath the building cannot hold the waste indefinitely, and so the waste is pumped out from under the building and placed into large manure pits or "lagoons." However, the lagoons apparently cannot contain all the waste, because defendants pump the liquid waste into equipment which sprays the manure over nearby sprayfields.

Defendants' argument that sprayfields cannot fall within the definition of point source because animals are not confined in the sprayfield area is nonsensical. First, CAFOs are unlike traditional farms which feed out smaller numbers of animals in a larger area of land allowing the waste to decompose naturally and to support vegetation in the animals' living area. Instead, CAFOs must develop a more sophisticated way of dealing with the large quantities of waste produced by the confined animals. As explained by former Senator Robert Dole,

8

> Animal waste, until recent years, has not been considered a major pollutant . . . . The picture has dramatically changed, however, as development of intensive livestock and poultry production on feedlots and in modern buildings has created massive concentrations of manure in small areas. The recycling capacity of the soil and plant cover has been surpassed. . . . Waste management systems are required to prevent waste generated in concentrated production areas from causing serious harm to surface and ground water.

S. Rep. No. 92-414, at 100(1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3761.

Excluding parts of the waste management system from the definition of a CAFO by limiting the CAFO area to the land underneath the feeding areas would compromise the goals of the CWA by allowing widespread pollution by industrial feedlots pumping waste into other areas of their farms.

By definition, a CAFO is not limited to the concentrated animal feeding area because the word "operation" encompasses the entire process involved in running a concentrated animal feeding facility. The sprayfield areas are a vital part of defendants' operations and cannot be separated from the confinement areas merely because the waste has been moved from one area of the farm to another. See Concerned Area Residents for the Env't v. Southview Farm, 34 F.3d 114, 115 (2nd Cir. 1994) (holding that "liquid manure spreading operations are a point source" under the CWA because farm fell within CAFO definition).

9

Similarly, defendants' argument that the sprayfields come within the agriculture storm water exemption is also unpersuasive. First, this court has concluded that sprayfields can qualify as point sources when they are part of CAFOs. It is clear that point sources are not subject to the storm water exemption. Federal regulations limit the storm water exemption to non-point sources including "storm water runoff from orchards, cultivated crops, pastures, range lands and forest lands, but <u>not discharges from concentrated animal feeding operations</u>." 40 C.F.R. § 122.3 (emphasis added).

Second, the question of whether the defendants' activities contribute to the runoff reaching navigable waters is a question of fact inappropriate for resolution on a motion to dismiss. Therefore, defendants' motion to dismiss Count III is also DENIED.

**D.  Count V**

Defendants also move to dismiss Count V because they allege that animal waste applied to the sprayfields is not "solid waste" under the RCRA because it is used as fertilizer. Legislative history of the RCRA clarified that "[a]griculture wastes which are returned to the soil as fertilizer or soil conditioners are not considered discarded material in the sense of this legislation." H. Rep. No.94-1491 (1976), <u>reprinted in</u> 1976 U.S.C.C.A.N. 6238, 6240. As plaintiffs point out, however, no blanket animal waste exemption excludes animal waste from the "solid waste" definition.

10

Instead, the determination of whether defendants "return" animal waste to the soil as organic fertilizer is a functional inquiry focusing on defendants' use of the animal waste products rather than the agriculture waste definition. See 40 C.F.R. § 257.1(c)(1) ("The criteria do not apply to agricultural wastes, including manures and crop residues, <u>returned to the soil as fertilizers or soil conditioners</u>." (emphasis added)); Id. § 261.4(b)(1) (excluding solid waste 1) generated by "raising of animals, including animal manures" . . . 2) "<u>and</u> which are returned to the soils as fertilizers." (emphasis added)).

The question of whether defendants return animal waste to the soil for fertilization purposes or instead apply waste in such large quantities that its usefulness as organic fertilizer is eliminated is a question of fact. Defendants' motion to dismiss Count V is DENIED.

### IV. Constitutional Challenges

Defendants assert that the citizen enforcement provisions of the CWA and RCRA violate various constitutional provisions. Defendants argue these citizen suit enforcement provisions allowing citizens to sue persons who violate federal law offend Article II's 1) Vesting Clause which vests all executive power in the President; 2) Appointment and Removal Clause, which governs the appointment of officers of the United States, and 3) Take Care Clause which requires the President to ensure that the laws be faithfully

11

executed. In sum, defendants argue that Article II places significant constraints on Congress's power to use private enforcement agents outside the Executive's control to protect the interest of the public as a whole.

Defendants admit that their argument has not been adopted by any court in the United States. Moreover, adopting defendants' position would create an uneasy tension with case law in the Fourth Circuit allowing citizen suits to proceed under the CWA in light of various standing challenges. See, e.g., Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 151 (4th Cir. 2000) (holding plaintiff's injuries were redressable under citizen suit provision of CWA). The court also notes that defendants' characterization of private citizen enforcement groups as "private attorneys general" seeking to "prosecute" violations against the United States is misleading. Unlike attorneys general prosecuting on behalf of the United States, citizen suits require environmental plaintiffs to establish that they have suffered individualized injuries, and do not allow those with only generalized grievances to bring actions. These plaintiffs do not seek solely to vindicate the public interest, but to address a concrete injury suffered by both plaintiffs and the public.

After careful review of the parties' argument and the relevant case law, the court concludes that the broad and novel theory advocated by defendants is unpersuasive, and DENIES defendants'

motion to dismiss on constitutional grounds.

## V. Remedies Available to Plaintiffs

Plaintiffs concede that they have no right to recover private damages under the CWA and RCRA. Instead, plaintiffs seek injunctive relief and civil penalties under the CWA and RCRA. Any alleged "clean-up costs" would only be ancillary to injunctive relief requiring defendants to come into compliance with the statutes. Defendants' motion to dismiss certain damage claims asserted by plaintiffs is accordingly DENIED.

## CONCLUSION

For the foregoing reasons, the court DENIES defendants' motions to dismiss.

This 20th day of September, 2001.

MALCOLM J. HOWARD
United States District Judge

At Greenville, NC
#6

13