IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

No. 4:01-CV-27-H

WATERKEEPER ALLIANCE, INC., )
et al., )
    Plaintiffs, )
)
v. )   **ORDER**
)
SMITHFIELD FOODS, INC., )
et al., )
    Defendants.

This matter is before the court on plaintiffs' Renewed Motion to Enforce the Consent Decree [DE #133]. Defendants[1] filed a response in opposition, [DE #139]. Plaintiffs also filed a motion for leave to file a reply [DE #140]. For good cause shown, the motion is GRANTED and the court considers the reply in its adjudication of this motion.

## Procedural History

This Court entered a Consent Decree in this matter on March 24, 2006, [DE #93] ("Consent Decree").[2] On December 4, 2013, defendants filed a Notice of Invocation of Formal Dispute Resolution Pursuant to Consent Decree. [DE #101]. This Notice

---

[1] After the filing of this action on February 28, 2001, and prior to the entry of the Consent Decree on March 24, 2006, Murphy-Brown, LLC ("Murphy-Brown"), was incorporated as a wholly-owned subsidiary of Smithfield, assuming ownership of and responsibility for Smithfield's hog production operations. Murphy-Brown is a named defendant in this court's Consent Decree, [DE #93].
[2] This Court's continuing jurisdiction is provided in § XX of the Consent Decree, [DE #93].

was filed after defendants had already provided a Notice of Dispute to plaintiffs on October 31, 2013, pursuant to paragraph 43 of the Consent Decree, providing for a period of thirty calendar days for the parties to resolve the dispute informally. The parties participated in a mediated settlement conference on January 27, 2014, and on several dates by telephone until May 22, 2014, with Mediator Thomas R. West, all resulting in an impasse. [DE #110].

On October 14, 2015, plaintiffs filed a Motion to Enforce the Consent Decree, and in the Alternative, to Resolve Defendants' Consent Decree Dispute. [DE #114]. Defendants filed a response, [DE #117], and plaintiffs filed a reply. [DE #119]. On July 5, 2016, this Court ordered the parties to participate in a court-hosted settlement conference to resolve the dispute. [DE #120]. United States Magistrate Judge Robert B. Jones, Jr., conducted two settlement conferences. [DE #123 and #132]. The first settlement conference on September 7, 2016, resulted in a tentative settlement with an order for parties to consummate their settlement or otherwise file a status report. [DE #123 and #124]. On September 13, 2016, this court issued an order dismissing without prejudice plaintiffs' Motion to Enforce the Consent Decree, and in the Alternative, to Resolve Defendants' Consent Decree Dispute. [DE #125]. On October 24, 2016, the parties filed a joint status report requesting a telephonic conference. [DE #128]. After a telephonic conference on November 1, 2016, the parties had

2

differing interpretations of the terms of settlement. [DE #130]. On December 8, 2016, United States Magistrate Judge Robert B. Jones, Jr., conducted a second in-person settlement conference, which resulted in an impasse. [DE #132]. On March 14, 2017, plaintiffs filed their Renewed Motion to Enforce the Consent Decree, and in the Alternative, to Resolve Defendants' Consent Decree Dispute. [DE #133].

## Statement of the Facts

This Consent Decree, [DE #93], resolved the claims pled in the amended complaint, [DE #54], filed May 29, 2002, pursuant to the Clean Water Act ("CWA"), section 505, 33 U.S.C. § 1365, and pursuant to the Resource Conservation and Recovery Act, ("RCRA"), section 7002, 42 U.S.C. § 6972. The Consent Decree included an agreement by defendants to remediate groundwater pollution at its Murphy-Brown hog production facilities in Eastern North Carolina. Central to the Consent Decree is the Ground Water Risk Ranking ("GWRR") Program in Section IX and Ex. E. [DE #93 at 25; DE #93-6 Ex. E]. Plaintiffs allege the goal of the GWRR Program is to mitigate existing groundwater contamination at Murphy-Brown facilities in North Carolina by (1) evaluating these facilities for the potential of receptor[3] exposure to swine waste constituents

---

[3] "Receptor" is defined by the Consent Decree as "human and aquatic fauna, including benthic species." "Exposure" in the context of the Consent Decree is "the presentation of a swine waste constituent of concern at concentrations equal to or greater than the regulatory standards to a receptor via groundwater." "Swine waste constituents" are "selected constituents associated

3

via groundwater using site-specific data collection programs and (2) developing technically sound corrective action plans ("CAPS") to mitigate potential groundwater contamination. [DE #93-6 Ex. E at 2 §§ 1.1, 1.2]. Plaintiffs allege the parties agreed that S&ME, the mutually agreed upon independent consultant ("consultant"), would have substantial discretion to exercise its technical expertise and professional judgment in order to conduct the facility evaluations needed to achieve the GWRR program's goal of reducing the risk of groundwater contamination under the Consent Decree.

The Consent Decree outlined three progressive phases under the GWRR program. Phase I included the development and use of the Risk Ranking System ("RRS") to evaluate approximately 260 farms and facilities. Farms would be evaluated and ranked into one of three categories: cut-off score exceeding 360; default trigger; and gap in data. Phase II involved the evaluation of the farms that were not previously eliminated from review under Phase I. Phase III involved the development of corrective action plans ("CAPS") for the remaining facilities.

Phase I was completed on October 14, 2011. The consultant found that eleven facilities advanced to Phase II.[4] Of the eleven

---

with swine wastes, to include nitrate, nitrite, ammonia, phosphorous, fecal coliform, cadmium, copper, lead, manganese, nickel, and zinc." Consent Decree, DE #93, Ex. E § 6.0.

[4] There were actually twelve facilities that advanced to Phase II, but one of the facilities is no longer owned or controlled by defendants.

facilities, seven were advanced to Phase II on the basis of lagoon leakage at the facilities, thereby activating a Default Trigger to Phase II. The remaining four facilities were advanced to Phase II on the basis of elevated nitrogen concentration in the facilities' production wells, activating the Default Trigger for groundwater contamination. [DE #115-2; #117-7 Scope of Work §§ 5.2-5.3]. Plaintiffs allege the consultant prepared a draft Scope of Work detailing data to be collected for the development of technically sound CAPS. The Final Phase II Scope of Work was issued on October 2, 2013. The Final Scope of Work identified data needed to develop technically sound CAPs during Phase III and detailed methods for the collection of this data.

Plaintiffs allege that over the last three years defendant Murphy-Brown has blocked the consultant from evaluating the eleven facilities that advanced to Phase II, resulting in continued threat to groundwater quality.

The Final Phase II Scope of Work provides "[t]he functional outcome of the Phase I evaluation was that a failure of either Cut-Off Score performance or Automatic Trigger performance was the conclusion that the potential of receptor exposure to swine waste constituents via groundwater, as embraced by the GWRRS, had been demonstrated." [DE #117-7 at 3 § 1.0]. The consultant found the presence of Default Triggers demonstrated a potential of receptor exposure to swine waste constituents via groundwater, and

therefore required a CAP to mitigate the conditions. [DE #115-2; #117-7]. The consultant has further stated in the Final Phase II Scope of Work that the provided reports of Geo Solutions[5] by defendants have been considered, and the eleven farms are not eligible for re-scoring.

Defendants argue the Phase II Scope of Work, [DE #117-7], is inconsistent with the Consent Decree in two critical respects. First, defendants contend the final Phase II Scope of Work concludes that the "potential of receptor exposure to swine waste constituents via groundwater . . . had been demonstrated" based solely on the default triggers, thereby merging Phase II with Phase III. Second, the Final Phase II Scope of Work provides for additional data collection at all eleven farms based on "conceptual" Scope of Work plans that call for the collection of data needed "to develop a technically sound CAP which, upon implementation, would lead to removal of the Automatic Trigger."

---

[5] The data for Phase I had been supplied to S&ME, the agreed-upon consultant by the defendants, pursuant to the Consent Decree, [DE #134-1 Phase I Scoring Final Report at 3-4; DE #93-6 Ex. E at § 1.4]. After approving the advancement of eleven farms from Phase I to Phase II and prior to the consultant's issuance of the draft Phase II Scope of Work, Murphy-Brown retained another consulting firm, Geo Solutions Limited, Inc. ("Geo Solutions") to collect additional data related to the potential of receptor exposure to swine waste constituents via groundwater at these farms. Geo Solutions conducted site visits at each farm including electromagnetic profiling, visual inspection, water level monitoring (lagoon and water table), and geochemical analysis according to accepted protocols. In separate reports issued for the seven farms with reported lagoon leakage and four farms with elevated nitrogen concentrations, Geo Solutions found no evidence the lagoons were leaking and concluded the sources of elevated nitrogen concentrations was not groundwater contamination. While the hiring of a separate consultant was not contemplated by the Consent Decree, the agreed-upon consultant still agreed to consider the data.

6

[DE #117-7 at § 4.0]. Defendants argue the Final Scope of Work should not merge Phase II and Phase III by proceeding to CAPS for the eleven farms advanced to Phase II by a Default Trigger.

**COURT'S DISCUSSION**

The scope of a consent decree should be determined by application of rules of contract construction. Anita's New Mexico Style Mexican Food, Inc., v. Anita's Mexican Foods Corp., 201 F.3d 314, 319 (4th Cir. 2000)(citing United States v. Armour & Co., 402 U.S. 673, 681-82 (1972); United States v. ITT Continental Baking Co., 420 U.S. 223 (1975)). "[T]he scope of a consent decree must be discerned within its four corners and not by reference to what might satisfy the purposes of one of the parties to it." Armour & Co., 402 U.S. at 682 (1972). When a contract between parties confers discretion on one party that will affect the rights of another, such discretion must be "exercised in a reasonable manner based upon good faith and fair play." Mezzanotte v. Freeland, 20 N.C. App. 11, 200 S.E.2d 410, 414 (1973), cert denied, 201 S.E.2d 689 (1974). Plaintiffs request the court to order Murphy-Brown to fulfill its obligations under the Consent Decree, specifically to provide written notice to consultant to proceed with the GWRR Program Phase II Data Needs Assessment and Scope of Work, developed by consultant. [DE #93-6 Ex. E and DE #115-2]. Defendants object to the consultant's Final Phase II Scope of Work.

The court finds the bases for defendants' objections are unfounded in light of the terms of the Consent Decree. Defendants argue the Final Scope of Work should not merge Phase II and Phase III by proceeding to develop CAPS for the eleven farms advanced to Phase II by a Default Trigger, generated by conditions including lagoon leakage and elevated nitrogen concentrations. The defendants contend Phase II should include further evaluation before all eleven farms are advanced to Phase III, requiring data collection for development of CAPS.

Under the Consent Decree, a Default Trigger is "[a] finding or fact that, in the [c]onsultant[']s professional opinion, automatically categorizes a Farm/Facility into a Phase II evaluation, regardless of the Farm/Facility's RRS score." [DE #93-6 Ex. E § 6.0 at 18]. According to this definition, the consultant has wide latitude to define a Default Trigger. The parties have already agreed to the eleven farms being advanced to Phase II on the basis of Default Triggers, and thus the parties cannot contest this at this time. Further, the consultant considered the reports of Geo Solutions submitted by defendants and found there was no potential for re-scoring the eleven farms.

The consultant has found in the Phase II Scope of Work that the presence of Default Triggers indicates a potential of receptor exposure to swine waste constituents via groundwater, requiring CAPS to mitigate the conditions. [DE #115-2; #117-7]. The Consent

8

Decree provides, "[f[arms/[f]acilities remaining for Phase III consideration will be those [f]arms/[f]acilities identified by the RRS that pose an identified potential of receptor exposure to swine waste constituents via groundwater on the basis of the cut-off score." [DE #93-6 Ex. E at § 1.4 at 3]. The farms were not advanced on the basis of a cut-off score, but rather because the consultant found the presence of Default Triggers, which in its professional judgment, indicates a potential of receptor exposure to swine waste constituents via groundwater. Thus, advancing the eleven farms to Phase III for data collection and development of CAPS is in accordance with the Consent Decree.

Further, the Consent Decree provides that a corrective action is "[s]pecific to Phase III herein, [a] generally accepted cost effective method or methods that theoretically result in a [f]arm/[f]acility being re-ranked below the cut-off score and/or mitigate the conditions that generate a Default Phase II Trigger." [DE #93-6 Ex. E § 6.0 at 18]. Thus, mitigation of conditions that generated a default trigger is the purpose of a corrective action or CAP. Id. Considering that each of the farms were advanced to Phase II for a Default Trigger, generated by conditions including lagoon leakage and elevated nitrogen concentrations, the corrective action is necessary to mitigate such conditions.

Therefore, the consultant's proposed Phase II Scope of Work providing for further data collection to develop a technically

9

sound CAP for each farm is in accordance with the Consent Decree, and the defendants are directed to issue written notice to proceed to the consultant in accordance with the Phase II Scope of Work, [DE #115-2 and #117-7].

**CONCLUSION**

For the foregoing reasons and for good cause shown, plaintiffs' Renewed Motion to Enforce the Consent Decree, [DE #133], is GRANTED, and defendants are directed to issue written notice to proceed to the consultant in accordance with the Phase II Scope of Work. Plaintiffs' Motion for Leave to File a Reply Memorandum [DE #140], is GRANTED.

SO ORDERED this 4th day of December 2017.

Malcolm J. Howard
Senior United States District Judge

At Greenville, NC
#35

10